AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

**FILED**
United States District Court
Albuquerque, New Mexico

Mitchell R. Elfers
Clerk of Court

# UNITED STATES DISTRICT COURT

### for the

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Black cell phone taken from the person of Demetrius<br>Bailey, more fully described in Attachment A | )<br>)<br>)<br>)<br>)<br>) |

Case No.  **23mr2178**

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, attached hereto and incorporated herein.

located in the _____ District of _____ New Mexico _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, attached hereto and incorporated herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1951 | Armed Robbery |
| 18 U.S.C. §§ 922(g)(1) and 924 | Felon in Possession of a Firearm |

The application is based on these facts:

See attached Affidavit, attached hereto and incorporated herein.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Sarah Rich, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
*(specify reliable electronic means)*.

Date:  11/24/2023

_____
*Judge's signature*

City and state:  Albuquerque, New Mexico

Jennifer M. Rozzoni, U.S. Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

IN THE MATTER OF THE SEARCH OF A
BLACK CELL PHONE TAKEN FROM
THE PERSON OF DEMETRIUS BAILEY,
MORE FULLY DESCRIBED IN
ATTACHMENT A

Case No. _____

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Special Agent ("SA") Sarah Rich, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.      I believe the electronic device contains evidence related to a series of armed robberies and firearms violations being investigated by the Federal Bureau of Investigation ("FBI") and Albuquerque Police Department ("APD") Armed Robbery Unit.

3.      I am a Special Agent with the FBI and have been so employed since November of 2014. As such, I am a federal law enforcement officer within the meaning of Rule 41 of the Federal Rules of Criminal Procedure ("FRCP"). As a Federal Agent, I am authorized to investigate violations of the laws of the United States and have authority to execute arrest and search warrants issued under the authority of the United States. I am assigned to the Albuquerque Field Office of the FBI and the FBI's Violent Crime Task Force ("VCTF"). I have received on-the-job training from other experienced agents and detectives in the investigation of gang-related crimes, narcotics trafficking, firearms violations, carjackings, Hobbs Act robberies, bank robberies, homicides,

assaults, terrorism violations, and cybercrime. My investigative training and experience includes, but is not limited to, interviewing subjects, targets, and witnesses; writing affidavits for and executing search and arrest warrants; managing cooperating sources; collecting evidence; conducting surveillance; and analyzing public records.

4.     This affidavit is based on information obtained from robbery victims, witnesses, and FBI and APD investigators who have participated in this investigation. This affidavit does not set forth all of my knowledge or summarize all of the investigative efforts in this investigation.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

5.     The property to be searched consists of one cellular telephone, as described in Attachments A and B (hereafter referred to as the "Device") and is identified as follows:

   a.   A black cellular phone recovered from the person of DEMETRIUS **BAILEY** (hereafter **BAILEY**), year of birth ("YOB") 1983, on September 28, 2023, at the time of his arrest by APD personnel.

   b.   This Device is currently securely stored at the Federal Bureau of Investigation evidence room located at 4200 Luecking Park Ave NE, Albuquerque, NM 87107.

6.     The applied-for warrant would authorize the forensic examination of the Device for the purpose of identifying electronically stored data described in Attachment B.

## CRIMINAL ACTIVITIES AND CELLULAR DEVICES

7.     Based on my training, experience and participation in this and in similar investigations, I know that the use of digital media, including smartphones, tablets, cellular phones, and digital devices, has become part of everyday life. People carry their cell phones with them at nearly all times.  This is also true for persons involved in criminal offenses, including crimes of violence such as armed robberies and firearms violations as well as drug trafficking and fencing operations.  As a result, cell phones often possess evidence of user attribution and criminal activity.

8.      Based on my training and experience I know that individuals involved in criminal activity use cellular telephones during the course of planning, executing and concealing a criminal act.  In addition, individuals use cellular telephones to communicate about the crime with co-conspirators, family and other associates before, during, and after a criminal act has been committed.

9.      Information stored in electronic form on cellular telephones can provide evidence of armed robberies, drug trafficking, fencing operations and violations of federal firearms statues. Modern cellular telephones can contain electronic communications, which include, but are not limited to, phone calls, text messages, SMS (Short Message Service) messaging, MMS (Multimedia Messaging Service) messaging, social media posts and messaging, and smartphone application messaging services.

10.      Smartphones, tablets, cellular phones, and digital devices are frequently capable of storing messages, emails, social media communications, and communications made over smartphone applications. The content of these communications will often provide evidence of criminal activities and firearms offenses. Based on my training and experience I know that cellular telephones can contain contact lists and date and time stamped call logs which may contain names, addresses, phone numbers, electronic mail addresses and other identifying information that can help determine those participating in a criminal act.  In addition, this communication information contained on the cellular telephone can assist in determining cellular telephone user attribution.

11.      Based on my training and experience I know that modern cellular telephones can access the Internet, allowing the phone's user to send and receive electronic mail, browse web addresses, search browsers, and other information on the Internet which may assist in the commission, executing or concealment of a criminal act.

12.     Violent offenders (including those who commit armed robberies and firearms violations) often take, or cause to be taken, photographs and/or videos of themselves, their associates, and their property, to include property taken during the alleged crimes or the illegal firearms. Smartphones, tablets, cellular phones, digital cameras, and other digital devices, often have the capability to take still photos and videos and save them indefinitely on the device's storage medium. These photographs may contain metadata that show the date, time, and location of the photograph. Further, photo galleries can contain photographs of subjects involved in the crimes and instrumentalities of the crime itself. In addition, these photographs can assist in determining user attribution of the phone itself.

13.     Based on my training and experience, I know that individuals involved in crimes of violence often have altercations, disagreements, and arguments prior to the commission of a crime of violence even with the eventual victims of crimes. Based on my training and experience, I also know that conspirators in crimes often have altercations, discussions, disagreements and arguments following the commission of a crime. In some cases, these communications occur using cellular devices which may contain evidence of a crime or motivations for committing a crime. Additionally, these conversations can occur hours, minutes, days, weeks or months prior to the crime. This includes but is not limited to text message communications, telephone calls, and email communications.

14.     Electronic data stored on cell phones can show how and when the cellular device and associated cellular service were accessed or used. This timeline information can help investigators understand the chronology of the crime under investigation. Additionally, information stored by the wireless provider may indicate the geographic location of the cellular device and user at a particular time (e.g., historic cell-site location information; location integrated

into an image or video sent via text message to include both metadata and the physical location displayed in an image or video).

15.     As indicated above, the Device is currently in the lawful possession of the Federal Bureau of Investigation at 4200 Luecking Park Ave NE, Albuquerque, NM 87107, where it was transferred after its seizure from **BAILEY** on September 28, 2023, at the time of his arrest by APD personnel.  In my training and experience, I know that the Device has been stored by the FBI in a manner in which its contents are in substantially the same state as they were when the Device first came into the possession of the FBI. As of the time of the signing of this affidavit, to my knowledge no one has requested the return of the Device.

## STATEMENT OF PROBABLE CAUSE

16.     Between August 26th and September 16th, 2023, I believe **BAILEY** and co-conspirator JAMES **METTS** (hereafter **METTS**), YOB 1978, conducted a series of armed robberies in Albuquerque, New Mexico.

17.     Based on my training, experience, and the facts as set forth in this affidavit, I believe there is probable cause that the Device will contain evidence of **BAILEY's** violations of 18 U.S.C. § 1951 (Armed Robbery) and 18 U.S.C. § 922(g) (Felon in Possession of a Firearm).

18.     As discussed above and as described below in more detail, two men (whom I believe to be **BAILEY** and **METTS)** conducted a series of armed robberies in Albuquerque, New Mexico, between August 26 and September 16, 2023.  Throughout this affidavit, in my description of each of the armed robberies, I use the term "UNSUB 1" to refer to the shorter, lighter-complexioned of the two men (believed to be **METTS**) and "UNSUB 2" to refer to the taller, darker-complexioned of the two men (believed to be **BAILEY**).  From my review of APD reports

of these robberies and my conversations with the investigating APD detectives, I understand the following:

### *First Armed Robbery*

19.     On August 26, 2023, at approximately 5:37PM, APD personnel were dispatched to the Metro by T-Mobile retail store located at 2400 Juan Tabo Blvd NE, Albuquerque, New Mexico, in reference to an armed robbery. Employee victims R.L. and S.B. told responding law enforcement officers the following: That evening, an unknown male had entered the store and claimed he wanted to pay his phone bill. While R.L. was in the process of assisting this customer, he walked out of the store, after which R.L. reported feeling uncomfortable and began to pull money out of the register. Soon after two male unidentified subjects (UNSUBs) then entered the store, both wearing masks and baggy clothing. S.B. asked the UNSUBs if they needed assistance, to which they responded they were just looking. After S.B. returned to the cash register area, one of the males (UNSUB 1) produced a black handgun and pointed the gun at R.L. and S.B., demanding money. UNSUB 2 took the money from the cash registers, and then the UNSUBs forced R.L. and S.B. to the back of the store and ordered them to lay on the ground at gunpoint. The UNSUBs then took multiple tablets and phones and departed, taking additional items as they left through the front of the store.

20.     A subsequent review by APD personnel of store video surveillance footage appeared to confirm the reporting provided by R.L. and S.B. The footage shows two UNSUBs enter the store, with a possibly Hispanic male (UNSUB 1) wearing a gray Las Vegas Raiders baseball hat, black sunglasses, a gray hooded sweatshirt, black pants, black shoes, no gloves, with a tattoo on the top of his left hand. A Black male (UNSUB 2) was observed wearing a bandana patterned gray hooded sweatshirt, a black baseball hat, black pants, and tan Timberland shoes. The footage shows UNSUB 1 pulling a black firearm from his waistband and pointing the black

handgun at the employees, forcing them to open a cash register while UNSUB 2 proceeded to the front of the store and locked the front door from the interior. The UNSUBs then forced the employee victims to the rear of the store where the two employees were forced to lay on the ground at gunpoint. The two UNSUBs then proceeded to fill a large tote bag with merchandise. Metro by T-Mobile reported to APD that the stolen merchandise included approximately twenty iPhones valued at approximately $20,000, in addition to other merchandise.

### *Second Armed Robbery*

21.     On September 1, 2023, at approximately 7:54PM, APD personnel were dispatched to the T-Mobile store located at 3301 Coors Blvd NW, Albuquerque, NM 87120 in reference to an armed robbery. According to employee victims, P.P. and D.M., the following occurred: Two male unidentified subjects (UNSUBs) approached the store, with at least one UNSUB (UNSUB 1) armed with a handgun. UNSUB 1 was described as a possibly Hispanic male, approximately 5'8" in height, and UNSUB 2 as a Black male approximately 6'3" in height. Both UNSUBs were described as wearing black masks, black hoodies, black pants, black sunglasses, and black gloves. The UNSUBs demanded P.P. open the cash register, and when P.P. reported she was unable to open the register with a key the UNSUBs forced P.P. and D.M. to the rear of the store where merchandise is kept in locked cages. While en route to the rear of the store, one UNSUB took P.P.'s personal cell phone from her back pocket. Once the two victims opened the merchandise cage, both UNSUBs entered the cage and took multiple iPhones and other merchandise.

22.     One of the items taken by the UNSUBs was a decoy tracker phone that was monitored by Ensurity Mobile. Ensurity Mobile provided APD with a link to monitor the phone, which updated its location every five seconds. The decoy phone was viewed traveling to the east side of Albuquerque and ultimately stopping at 6720 Cochiti Rd SE #A in Albuquerque, NM. On

September 2, 2023, APD obtained and executed a state warrant to search 6720 Cochiti Rd SE #a, where they recovered multiple electronic devices taken from the T-Mobile store. However, none of the individuals at the location during the execution of the search warrant matched the description of the UNSUBs.

23.     Subsequent review by APD personnel of the surveillance footage captured at the victim T-Mobile location appeared to largely confirm the reporting by the two victim employees, and showed two males UNSUBs, one a Black male (UNSUB 2) wearing a black hooded sweatshirt, a black baseball hat, brown pants, tan Timberland boots and no gloves. UNSUB 1 was a possibly Hispanic male wearing a black beanie, black sunglasses similar to those worn by UNSUB 1 in the aforementioned August 26th robbery, a black hooded sweatshirt with "Champion" on the front, dark pants, brown boots, and black gloves with white script. An inventory list provided to APD by T-Mobile Asset Protection estimated a total loss of $41,000, for approximately 60 stolen phones.

### *Third Armed Robbery*

24.     On September 9, 2023, at approximately 7:21PM, APD personnel were dispatched to the Metro by T-Mobile store located at 2225 Wyoming Blvd NE, Albuquerque, NM in reference to an armed robbery. According to employee victims D.C. and C.T., the following occurred: Two unidentified male subjects (UNSUBs) lingered outside the store for several minutes prior to entering. Upon entering, one UNSUB (UNSUB 1), described as a Hispanic adult, approximately 5'5" in height, 25-35 years of age, wearing a white Puma hoodie, a gray Las Vegas Raiders baseball hat (similar to the hat worn by UNSUB 1 during the robbery on August 26th), black gloves with white script, blue jeans, brown boots, and a face mask, with several tattoos on his face and neck, asked both D.C. and C.T. to see the iPhones while the second UNSUB (UNSUB 2), described as a Black male, approximately 6'0" in height, 25-35 years of age, wearing a grey hoodie

with white undershirt, a face mask and white shoes, sat down. UNSUB 1 then immediately pulled a black handgun out of his waistband and pointed the firearm at C.T and demanded C.T. open the cash register. UNSUB 1 then grabbed approximately $50 from the cash register. UNSUB 1 and UNSUB 2 then told D.C. and C.T. to go to the back room and stand in the corner while UNSUB 1 still had the firearm in his hand and the UNSUBs took merchandise from the back-room storage area.

25.     APD personnel reviewed the store's surveillance footage, which showed UNSUB 2 taking several electronic devices from an orange bin in the back area of the store. The UNSUBs then exited the store, taking another $20 from the cash register as they left. The UNSUBs entered an older model black sedan with silver trim waiting on the north side of the building. This vehicle was driven by an unknown third UNSUB. D.C. estimated the two UNSUBs took at least 12 iPhones (each worth approximately $500) and other electronics. Metro by T-Mobile reported total merchandise losses of approximately $6,000 in addition to the $70 taken from the cash register.

### *Fourth Armed Robbery*

26.     On September 12, 2023, at approximately 10:41AM, APD personnel were dispatched to a Verizon store located at 11012 Montgomery Blvd NE, Albuquerque, NM 87111 in reference to an armed robbery. According to employee victim B.G., the following occurred: A suspicious Black female who identified herself as "Tanisha" came into the Verizon store and asked about transferring a phone to Verizon. "Tanisha" then went outside to her vehicle, which was parked east of the Verizon store and at a reportedly "suspicious" distance from the Verizon store. "Tanisha" came back to the Verizon store with paperwork and began going through it when two UNSUBs entered the store. UNSUB 1 was described as a Hispanic male, approximately 5'8" in height, with a medium build and two facial tattoos, and UNSUB 2 as a Black male, approximately

6'1" in height, medium build and wearing a face covering. B.G. told the UNSUBs he would be with them in a second, and UNSUB 1 immediately approached B.G. and brandished a firearm at him. B.G. was taken to the back room of the Verizon store by the two UNSUBs and told to open the safe. B.G. complied and the UNSUBs took an unknown amount of product and cash. The UNSUBs then put B.G. on the ground and left the store.

27.     Outside the store, a witness, L.T., saw a Black female in the parking lot rummaging through a light blue Honda or Toyota 4-door vehicle with Colorado plates. L.T. also witnessed a male UNSUB run out of the Verizon store wearing a small square backpack and jump into the passenger seat of the vehicle occupied by "Tanisha".

28.     A later review of surveillance footage photos by APD personnel show UNSUB 1 enter the front door of the Verizon business wearing black gloves with white script on the top of the hand (similar to the gloves worn during the robberies conducted on September 1st and September 9th), a black beanie (similar to the beanie worn during the robbery conducted on September 1st), black sunglasses, a black hooded sweatshirt, blue jeans, and black and white shoes. UNSUB 2 wore a black hooded sweatshirt, black pants, a black surgical mask, red shoes, and a duffel bag on his back.

### *Fifth Armed Robbery*

29.     On September 14, 2023, at approximately 2:00PM, APD personnel were dispatched to a T-Mobile store located at 2200 Juan Tabo Blvd NE, Albuquerque, NM 87112 in reference to an armed robbery. According to employee victim E.B., a male UNSUB, approximately 5'7" in height, with a dark complexion, wearing all black clothing, a white surgical mask, and brandishing a black Glock-style pistol entered the store, pointed the gun at E.B. and told E.B. to open the cash register. Once E.B. opened the register, the UNSUB took the

money from the register and left the store. E.B. followed the UNSUB shortly after the UNSUB's departure, and witnessed the UNSUB enter the passenger seat of a white Volkswagen sedan with a broken rear windshield covered in white plastic. E.B. reported the Volkswagen sedan either did not have a license plate or it was covered, and E.B. did not see the driver of the sedan.

30.     A subsequent review of store surveillance footage showed a Hispanic male wearing a black and blue hat with the script "Cookies," black sunglasses (similar to the sunglasses worn by UNSUB 1 in the previously described robberies), a white surgical mask, black gloves with white script on the top of the hand (matching the gloves worn by UNSUB 1 during the robberies on September 1st, 9th, and 12th), black pants, and black and white shoes (matching the shoes worn by UNSUB 1 during the robbery on September 12th). The video showed the UNSUB pull a handgun from his waistband and point the handgun at store employees.

### Sixth Armed Robbery

31.     On September 16, 2023, at approximately 3:27PM, APD personnel were dispatched to the JC Penney store located at 6600 Menaul Blvd NE, Albuquerque, NM 87110 in reference to an armed robbery. According to employee victim C.M., at approximately 3:15PM hours two male UNSUBs entered the store. C.M. described UNSUB 1 as approximately 6'0" in height, with a "big build", wearing a red "Cookies" hat, black clothing, and an oversized winter coat. C.M. described UNSUB 2 as approximately 6'4" in height, "skinny," wearing a green t-shirt and blue jeans. The two UNSUBs enter through the south doors of the JC Penney on the first floor and went directly to the men's Levi department, where each UNSUB grabbed a stack of Levi jeans and headed directly back to the south doors. C.M. went to the doors in an attempt to stop the UNSUBs, and UNSUB 2 pushed her out of the way. As UNSUB 1 was heading out of

the doors, he pulled a black handgun out, pointed it at C.M.'s stomach, and she moved back. C.M. observed the UNSUBs leave in a gray Nissan Frontier pickup truck with no license plate, heading westbound. UNSUB 1 was driving with UNSUB 2 in the passenger seat.

32.     A review by the responding APD officer of store surveillance footage showed UNSUB 1 wearing a red "Cookies" hat, black clothing, a heavy coat and a scarf, with UNSUB 2 wearing a green Nike shirt and gray baseball hat. C.M. reported the UNSUBs took approximately 35 pairs of jeans valued at $2,432.50 before tax.

### Seventh Armed Robbery

33.     On September 16, 2023, at approximately 4:01PM, APD personnel were dispatched to the Metro by T-Mobile store located at 4408 Menaul Blvd NE, Albuquerque, NM 87110 in reference to an armed robbery. According to the victim employee, A.C., the following occurred: UNSUB 1, described by A.C. as a Hispanic male, approximately 20-30 years in age, wearing a hat, sunglasses, bandana and black or blue cloth, entered the business and began walking toward the counter. UNSUB 1 pulled out a black and silver handgun and pointed it directly at A.C., telling A.C., "don't touch your fucking phone." UNSUB 1 told A.C. to face the wall behind the counter and to put his hands on the wall. At this time a second male UNSUB, UNSUB 2, described by A.C. as approximately 20-30 years in age, wearing a hat, sunglasses, blue "Covid" mask, and a black or blue cloth, entered the store and came to the counter, where UNSUB 2 looked through the register and various cabinets. UNSUB 1 then ordered A.C. to the back area of the business, where UNSUB 1 told A.C. to lay flat on the ground and not look up. UNSUB 1 and UNSUB 2 then took items from multiple bins and cabinets. UNSUB 1 asked A.C., "Where are the iPhones?", to which A.C. replied he did not know. After some time, the two UNSUBs left the store, A.C. then alerted police, and A.C. identified that approximately 60-

70 cellphones had been taken by the UNSUBs, as well as $200 cash from the front register and multiple cellphone accessories.

34.     A subsequent review of store surveillance footage by APD personnel showed UNSUB 1 wearing a red "Cookies" hat (matching the hat worn by UNSUB 1 during the previous event at JC Penney), black sunglasses (matching the sunglasses worn by UNSUB 1 during the robberies on September 1st, September 9th, September 12th, and September 14th), black gloves with white script (matching the gloves worn by UNSUB 1 on the robberies that occurred on September 1st, September 9th, September 12th, and September 14th), a black cloth around his face, a black hooded jacket and dark-colored pants. UNSUB 1 was armed with a handgun with a silver slide and black grip. UNSUB 2 was a Black male, tall and thin, wearing all black clothing to include a black hooded sweatshirt and a duffle bag on his back, in addition to a green-colored shirt (matching the description of UNSUB 2 from the recent event at JC Penney) worn underneath the black hooded sweatshirt.

### *Arrest of METTS and Identification of BAILEY*

35.     After the September 16th events at JC Penney and Metro by T-Mobile, APD personnel put out a "BOLO" notice for the gray Nissan Frontier observed by C.M. fleeing JC Penney, and APD's Communications department received information from 3SI indicating a tracker was hidden in merchandise taken from the Metro by T-Mobile retail store located at 4400 Menaul Blvd NE. Detectives with APD's Investigative Support Unit (ISU) were able to track the 3SI tracker, located it traveling in a 2008 gray Nissan Frontier, and initiated a felony stop on the Frontier in the area of 8922 Central Ave SE in Albuquerque. After APD ISU personnel identified themselves as "Police," the female driver placed the Frontier in reverse and accelerated, crashing into an APD truck. The driver then accelerated the Frontier in an apparent attempt to flee and

crashed into a building, and then appeared to take steps to continue to attempt to flee. APD personnel used 40mm less-lethal munitions to break the vehicle's windows and attempt to stop the Frontier. After multiple commands, a man exited the passenger door and the female driver, later identified as Fayth WHELAN, exited the driver's door. An NCIC check of the Nissan Frontier (VIN 1N6AD07U98C444227) indicated the vehicle was stolen. The APD officer who responded to the call for service at the Metro by T-Mobile identified the man who exited the passenger door (later identified as James **METTS**) as UNSUB 1 from the September 16, 2023 Metro by T-Mobile armed robbery based on the officer's review of store surveillance video footage. **METTS** was arrested, and a search of his person revealed that he had black gloves similar to the gloves worn by UNSUB 1 at many of the earlier robberies, and a syringe with brownish liquid that appeared to be heroin. In addition, **METTS** was wearing clothing matching the clothing worn by UNSUB 1 during the armed robbery at the Metro by T-Mobile store located at 4400 Menaul Blvd NE, including the red "Cookies" hat observed upon review of store video surveillance. NCIC checks of **METTS** and WHELAN revealed two active felony warrants for **METTS** and two misdemeanor warrants for WHELAN.

36. APD Detective A.G. interviewed **METTS** after providing **METTS** his Miranda rights and **METTS** agreeing to speak with the Detective. During this interview **METTS** attempted to conceal his identity by giving a false name to Detective A.G. **METTS** also confessed to the robbery of the Metro by T-Mobile located at 4408 Menaul Blvd on the date of the interview. For these reasons, I believe **METTS** to be the UNSUB 1 who committed each of the aforementioned robberies. Later in the interview, **METTS** made a phone call to an unidentified female who provided the name of **METTS**'s accomplice as Demetrius **BAILEY**. A later review by Detective A.G. of surveillance footage of numerous armed robberies and

aggravated shoplifting incidents, including the armed robberies described above, showed **BAILEY** matched the physical description of UNSUB 2. Both Detective A.G.'s and my own reviews of **BAILEY**'s criminal history indicate that **BAILEY** has a criminal history of Organized Retail Crime and Aggravated Shoplifting.

37.     On September 17, 2023, APD officers obtained a state warrant to search the Nissan Frontier in which **METTS** was a passenger on September 16, 2023. The search warrant was executed on September 19, 2023, and APD evidence recovery personnel located three (3) phone boxes, three (3) phone cases, nine (9) cellular phones, a PSD 18 round of ammunition on the front passenger floor board, an A Merc 40 S&W round of ammunition in the front passenger door pocket, a JBL speaker on the front passenger floor board, a Bose speaker near the gear shift, a Hi-Point Model 9 9mm handgun bearing serial number P1792048 with silver a slide and black grip containing a magazine with four 9mm rounds and no round in the chamber. The Hi-Point 9mm was similar in appearance to the handgun used by UNSUB 1 in the armed robbery at 4400 Menaul Blvd NE at the Metro by T-Mobile store.

### *Arrest of BAILEY*

38.     Continued investigation into **BAILEY** revealed he had an outstanding warrant for aggravated shoplifting and was a known entity to APD's Organized Crime unit. In particular, Detective A.G. review prior surveillance footage of an aggravated shoplifting incident on or about July 11, 2023. The surveillance footage shows two men participating in the aggravated shoplifting incident. Neither man is wearing a mask, and based on the clear, high-resolution surveillance video, it appears that one of the two men is **METTS** (who is carrying a firearm) and the other is **BAILEY**. Thus, this surveillance footage appears to confirm that **METTS** and

**BAILEY** had taken part in armed shoplifting incidents before the August 26th – September 16th, 2023, series of armed robberies and firearms violations described in this affidavit.

39.     Further, **BAILEY**'s physical description aligns with the reported description of UNSUB 2: he is a Black male with a thin to medium build, weighing approximately 185 pounds and is 6'02". Again, in view of **METTS**' identification, the July 11, 2023 surveillance of **METTS** and **BAILEY** committing aggravated shoplifting, and **BAILEY**'s physical description, I believe **BAILEY** to be the UNSUB 2 who committed each of the aforementioned robberies.

40.     On September 20, 2023, Detective A.G. received a lawfully authorized state arrest warrant for **BAILEY** and provided the arrest warrant to APD's ISU for assistance in **BAILEY**'s apprehension.

41.     On September 28, 2023, at approximately 2:00PM ISU detectives were patrolling along Central Avenue in Albuquerque in areas **BAILEY** was known to frequent. **BAILEY** was positively identified by ISU at a bus stop, where he boarded a city bus. Surveillance was maintained on the bus until **BAILEY**'s exit near Central Avenue and Wyoming Blvd, where **BAILEY** was then observed walking on foot northbound on Wisconsin St NE. APD ISU personnel then affected the arrest of **BAILEY**, placing **BAILEY** in handcuffs, at which point **BAILEY** advised detectives he had a firearm in his waistband. The firearm—a Ruger 9E 9mm handgun bearing serial number 33778816 that was fully loaded with a round in the chamber— was recovered and rendered safe. The firearm was later confirmed as stolen. At the time of his arrest, **BAILEY** was also in possession of a black cell phone in a black protective case (the Device) and a dark gray Hex backpack similar to the backpack worn by UNSUB 2 in the previously described armed robberies.

### *Criminal Records of BAILEY and METTS*

42.     A review of **BAILEY**'s criminal history indicates the following felony convictions: Organized Retail Crime (Theft) (30-16-20.1(A)(1)&(C)), Shoplifting (30-16-20) and Aggravated Shoplifting (30-16-20(E)).

43.     A review of **METTS**' criminal history indicates the following felony convictions: Trafficking a Controlled Substance/Possession with Intent to Distribute (30-31-20(A)(3)(B)(1)), Aggravated Battery with a Deadly Weapon (30-3-5(5)), 3 x Aggravated Assault with a Deadly Weapon (30-3-2-(A)), 2 x Tampering with Evidence (30-22-5) and Escape or Attempt to Escape a Peace Officer (30-22-10).

### *Interstate Nexus - Robberies*

44.     The victim businesses involved in the described armed robberies are Metro by T-Mobile x 2, T-Mobile x 2, Verizon, and JC Penney. Based on my training and knowledge, Metro by T-Mobile (formerly "MetroPCS") was acquired by T-Mobile US and is headquartered in Richardson, Texas. T-Mobile US has two headquarters locations, one in Bellevue, Washington and the other in Overland Park, Kansas. Verizon is headquartered in New York City, New York and JC Penney is headquartered in Plano, Texas. Therefore, each of these businesses engaged in interstate commerce and the armed robberies committed by **METTS** and **BAILEY** affected interstate commerce.

### **TECHNICAL TERMS**

45.     Based on my training and experience, I use the following technical terms to convey the following meanings:

     a.   Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication

through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

c.  Portable media player:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.  GPS:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.  The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.  PDA:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can store any digital data.  Most PDAs run computer software, giving them many of the same capabilities as personal computers.  For example, PDA users can work with word-processing documents, spreadsheets, and presentations.  PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

46.     Based on my training, experience, use, and research, I know that the Device has capabilities that allow it to serve as a wireless telephone, digital camera, and portable media player, GPS navigation device, and PDA.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used a particular device.

## **ELECTRONIC MEDIA AND FORENSIC ANALYSIS**

47.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

48.    *Forensic evidence*:  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the devices were used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on the Device because:

   a.   Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

   b.   Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

   c.   A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

   d.   The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

    e.   Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

49.    *Nature of examination:*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying electronic media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the computer or entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

50.    *Manner of execution:*  Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

51.    *Necessity of seizing or copying entire electronic media:*  In most cases, a thorough search of a premises for information that might be stored on electronic media often requires the seizure of the physical electronic media and later off-site review consistent with the warrant. In lieu of removing electronic media from the premises, it is sometimes possible to make an image copy of electronic media.  Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the electronic media, and to prevent the loss of the data either from accidental or intentional destruction.  This is true because of the following:

a.  The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. Electronic media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.  Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the electronic media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c.  Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of electronic media formats that may require off-site reviewing with specialized forensic tools.

52.   The Device is currently in the possession of the Albuquerque FBI Evidence Control Room and has been stored in a manner in which the contents are, to the extent material to this investigation, in substantially the same state as it was when the Device was first seized by APD personnel.

## **CONCLUSION**

53.     Based on my training and experience and the facts set forth in this affidavit I respectfully submit that there is probable cause to believe that evidence of the aforementioned violations of United States Code are on the Device recovered during this investigation.  I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B.

54.     This search warrant application has been reviewed and approved by Maria Stiteler.

Respectfully submitted,

Sarah Rich
Special Agent
Federal Bureau of Investigation

SUBSCRIBED ELECTRONICALLY AND SWORN
TELEPHONICALLY TO ME ON NOVEMBER ___24___, 2023:

HONORABLE JENNIFER M. ROZZONI
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF NEW MEXICO

**ATTACHMENT A**

The property to be searched is the following cellular telephone:

(1) a black cellular phone in black case recovered from the person of Demetrius BAILEY (the Device).

The Device is currently maintained by the FBI at 4200 Luecking Park Ave NE, Albuquerque, New Mexico.

**ATTACHMENT B**

1)      All records on the Device described in Attachment A that relate to violations of

18 U.S.C. § 1951 (Armed Robbery) and 18 U.S.C. § 922(g) (Felon in Possession of a Firearm)

committed by DEMETRIUS BAILEY, year of birth 1983 (hereinafter BAILEY), including:

     a.  lists of contacts and related identifying information;

     b.  any information related to possible co-conspirators, associates, or activities, including names, addresses, phone numbers, monikers, photographs, or any other identifying information;

     c.  cellular telephone account information for the Device;

     d.  Any communications via phone calls, text messages, email, Facebook, Twitter, or other web-based applications regarding the offenses described above;

     e.  Digital photographs related to the offenses described above;

     f.  Any information recording BAILEY's whereabouts between July 1st to September 28th, 2023;

     g.  Evidence indicating the geographic location of the Device at times relevant to the investigation;

     h.  Evidence of any contact between BAILEY and METTS;

     i.  Evidence of contact between BAILEY and others who may have assisted him with obtaining and/or selling firearms, illicit drugs and stolen merchandise;

     j.  Evidence of user attribution showing who used or possessed the Device, such as logs, communications, phonebooks, saved usernames and passwords, documents, and browsing history.

This warrant authorizes a review of electronic storage media and electronically stored

information seized or copied pursuant to this warrant in order to locate evidence, fruits, and

instrumentalities described in this warrant.  The review of this electronic data may be conducted

by any government personnel assisting in the investigation, who may include, in addition to law

enforcement officers and agents, attorneys for the government, attorney support staff, and

technical experts.  Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.